Daniel R. WOLPAW; Theresa M. Wolpaw, Petitioners–Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 93–2175.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 20, 1994.

Decided Feb. 17, 1995.

Frederick N. Widen (argued and briefed), Kahn, Kleinman, Yanowitz & Arnson, Cleveland, OH, for petitioners-appellants.

Teresa McLaughlin, Marion E.M. Erickson (argued and briefed), Gary R. Allen, Acting Chief (briefed), U.S. Dept. of Justice, Appellate Section Tax Div., Washington, DC, for respondent-appellee.

Before: MARTIN, KRUPANSKY and BOGGS, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

Daniel and Theresa Wolpaw appeal a Tax Court decision requiring them to include in gross income the value of tuition waivers for Theresa Wolpaw's medical school education at Case Western Reserve University. 66 T.C.M. (CCH) ¶ 49,164(M) (No.1993–322). The Tax Court reached its decision by interpreting Section 1853(f)(3)(A) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2085, 2872 (Oct. 22, 1986) (codified at 26 U.S.C. § 117 (note) (1988)). Section 1853(f)(3) allows a taxpayer to exclude the value of a tuition waiver for graduate-level study if such waiver would have been excludable under the tax regulations in existence on July 18, 1984, the effective date of the Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494 (July 18, 1984). We believe that the tuition waivers benefiting Theresa Wolpaw were excludable from gross income as "scholarships" under the relevant tax statute and regulations in effect on July 18, 1984. Therefore, we **REVERSE** the decision of the Tax Court and **REMAND** the case for recomputation of the taxes due.

The facts in this matter have been stipulated by the parties. During the relevant period for purposes of our analysis, Daniel Wolpaw, M.D., was a faculty member at Case Western Reserve University's medical school. As a faculty member, he and his dependents were eligible to receive a tuition reduction or waiver for classes taken at any college at the University, including its medical school. From August 1983 until May 1988, Theresa Wolpaw, Dr. Wolpaw's wife, was a full-time, graduate-level student at the University's medical school. During the years in question, the University and its medical school qualified as educational organizations described in Section 170(b)(1)(A)(ii) of the Internal Revenue Code for purposes of determining whether the tuition waivers were excludable under 26 U.S.C. § 117. While studying, Mrs. Wolpaw was not considered an employee of the University, nor was she required to teach or perform other duties in order to qualify for the tuition waivers from the University.

During the years 1987 and 1988, the Wolpaws received tuition waivers of $13,400.00 and $6,950.00, respectively. The University issued W–2 forms containing these amounts to Dr. Wolpaw, identifying them as fringe benefits. The Wolpaws did not include these amounts on their 1987 or 1988 joint federal income tax returns. After audit, the Commissioner issued a deficiency statement to the Wolpaws for $4,815.55 and $1,984.98 for the years 1987 and 1988, respectively, because the Commissioner considered the tuition waivers to be includable in gross income as compensation. The Wolpaws contend that the tuition waivers are excludable from gross income as "scholarships" under the transitional relief provided by Section 1853(f)(3) of the Tax Reform Act. They argue that although Section 117(d), added to the Code by the Deficit Reduction Act of 1984, eliminated

the exclusion for graduate students receiving tuition waivers, Congress enacted Section 1853(f)(3) in 1986 as a transitional rule to provide relief to graduate students who began their studies before June 30, 1985 (the date after which tuition reductions were to be included in gross income by graduate students).

The Wolpaws filed a petition with the Tax Court for relief from these assessed deficiencies. The Tax Court held that the tuition waivers must be included in the Wolpaws' gross income for 1987 and 1988 because they had not satisfied the requirements for excluding these waivers under Section 1853(f)(3)(A). The Tax Court reasoned that for the Wolpaws to be eligible to exclude the tuition waivers, the waivers must have been excludable in 1984. The Tax Court determined that the tuition waivers here would have been includable in gross income under the tax regulations in 1984 for two reasons.

First, the Tax Court believed that the waivers were awarded to Dr. Wolpaw, not Mrs. Wolpaw, and constituted compensation paid to him by the University. The Tax Court observed that the University had included the amounts of these waivers in Dr. Wolpaw's W–2 statements. At the time, 26 U.S.C. § 117 provided that "certain payments or allowances ... are not to be considered scholarships ... for purposes of the exclusion under Section 117." Treasury Regulation 1.117–4(c) (1984) defined these "certain payments" as:

(c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) ... any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

The Tax Court believed that this regulation applied to the Wolpaws' situation, that the tuition waivers were compensation to Dr. Wolpaw, and that they were therefore includable in gross income. The Tax Court reasoned that, because the allowances were made to Dr. Wolpaw "in his capacity of and because he was, an employee, and [because he] was not the person who pursued the studies or research" the amounts were compensation. As we discuss below, we believe that the Tax Court's view is not consistent with a plain reading of this regulation.

Second, the Tax Court believed the tuition waivers should have been included in the Wolpaws' gross income because Dr. Wolpaw had to be the person receiving the tuition waivers in order to exclude them pursuant to subsections 117(a)-(c), the only subsections enacted before July 18, 1984. The Tax Court believed that, unlike subsection 117(d), subsections 117(a)-(c) did not permit a waiver benefitting the spouse or dependent children of an employee to be treated as a waiver received by the employee. Subsection 117(d)(2)(B) permits a qualified tuition reduction benefitting "any person treated as an employee (or whose use is treated as an employee use) under the rules of section 132(f)" to be excluded. 26 U.S.C. § 117 (as amended in 1984). Under Section 132(f)(2), use by a spouse or dependent child would be treated as an employee use. This language was not included in subsections 117(a)-(c), and so, the Tax Court reasoned, Mrs. Wolpaw could not stand in Dr. Wolpaw's shoes for purposes of excluding the waivers from income. As the Tax Court stated:

There is no such provision [as section 132(f)] in either section 117(a), (b), or (c) to allow the spouse of the employee to be treated as the employee for purposes of the exclusion from income. In other words, Mrs. Wolpaw cannot stand in the shoes of Dr. Wolpaw for purposes of section 117(b). However, had Mrs. Wolpaw received the same tuition reductions or waivers as a student below the graduate level, Mrs. Wolpaw would stand in the shoes of Dr. Wolpaw for purposes of the exclusion from income, but only because of section 117(d)(2)(B) [of the Deficit Reduction Act]. Such a provision simply is not there with respect to graduate tuition waivers.

The Wolpaws disagreed with these conclusions and timely appealed the Tax Court's decision. We note that, contrary to the Tax Court's reasoning, according to the Private

Letter Ruling discussed below, the Internal Revenue Service had allowed children and spouses to exclude qualified tuition reductions under subsections 117(a)-(c). Also, under Treasury Regulation 1.117–3(a), tuition remissions received by the children of faculty members in bilateral remission arrangements were excludable as scholarships. Therefore, the lack of a reference in subsections 117(a)-(c) to subsection 132(f) does not determine whether, prior to July 18, 1984, the Commissioner had permitted exclusion, under subsections 117(a)-(c), for tuition waivers benefitting dependents.

We review decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." *Threlkeld v. Commissioner*, 848 F.2d 81, 83 (6th Cir. 1988) (quoting 26 U.S.C. § 7482(a) (1988)). The Tax Court in this case interpreted Internal Revenue Code provisions and related Treasury Regulations. Therefore, its decision on questions of statutory interpretation is subject to *de novo* review. *United States v. Hans*, 921 F.2d 81, 82 (6th Cir.1990). Further, as to questions of statutory interpretation initially arising in a judicial proceeding, we will not defer to the Commissioner's position, but will give the same weight and consideration to the positions of both the petitioners and the respondent in this matter. *Johnson City Medical Ctr. v. United States*, 999 F.2d 973, 975 (6th Cir.1993). Here, for example, the Commissioner's view that the tuition waivers are not scholarships is not a contemporaneous construction of a statute by the agency, but a position taken in litigation. Nevertheless, Treasury Regulations interpreting the tax law as of 1984 may be entitled to some degree of deference.

The degree of deference to be accorded an agency's interpretation of a statute Congress has charged it with administering varies, depending on several factors, including the existence of a statute mandating a standard of review, the form and formality of the interpretation, and the consistency of the agency's interpretation over time. As this Court observed in *Ohio State Univ. v. Secretary*, 996 F.2d 122, 123 n. 1 (6th Cir.1993), *vacated on other grounds*, —— U.S. ——, 114

S.Ct. 2731, 129 L.Ed.2d 854 (1994), "the degree to which courts are bound by agency interpretations of law has been like quicksand. The standard seems to have been constantly shifting, steadily sinking, and, from the perspective of the intermediate appellate courts, frustrating." Initially, agency interpretations of statutes were to be reviewed *de novo*. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944) (reasoning that "rulings, interpretations and opinions of the Administrator ... while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment...."). We have since been told to give "some deference" to the interpretation of an agency, *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454, 106 S.Ct. 2009, 2016, 90 L.Ed.2d 445 (1986) (observing that "[t]he legal issues presented ... are ... for the courts to resolve, although even in considering such issues the courts are to give some deference to the [agency's interpretation]"), and also to give "substantial deference" to an agency's construction of its own regulations. *Martin v. Occupational Safety and Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991) (citations omitted). And we have been instructed that we are not to overturn an agency's interpretation of a statute if the agency's interpretation is "reasonable." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *Whiteside v. Secretary*, 834 F.2d 1289, 1292 (6th Cir.1987) (identifying the question for the court as "whether the Secretary's interpretation is reasonable, consistent, persuasive"). Finally, if an agency's interpretation conflicts with a prior interpretation by the agency, we have been told it receives "considerably less deference than a consistently held agency view." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 447, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) (citations omitted) (cited in *Spencer v. Commissioner*, 43 F.3d 226, 234 (6th Cir. 1995)). However, Congress and the Supreme Court have also instructed the courts not to follow an agency's interpretation if that interpretation violates the specific language of the statute or is otherwise contrary

to law. 5 U.S.C. § 706(2)(A) (1988 & Supp. 1994); *Thomas Jefferson Univ. v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (determining that reviewing courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law") (quoting 5 U.S.C. § 706(2)(A)); *see also Demarest v. Manspeaker,* 498 U.S. 184, 190, 111 S.Ct. 599, 603, 112 L.Ed.2d 608 (1991) (stating that "administrative interpretation of a statute contrary to language as plain as we find here is not entitled to deference").

Our task in this case involves reviewing a position taken by the Commissioner in litigation (no deference) regarding a statute as to which no Treasury Regulations have been issued (26 U.S.C. § 1853(f)(3)). However, to determine the outcome of this case under Section 1853, we must review the agency's interpretation of 26 U.S.C. § 117 (1984) as evidenced by Treasury Regulations 1.117–1 through 1.117–4, which do not completely resolve this case. Of the three Treasury Regulations most relevant to our review, subsections 1.117–1, 1.117–3, and 1.117–4, the first two appear to result in exclusion, while the latter appears to lead to the contrary result. First, we shall examine the applicability of these Treasury Regulations to this case and defer to any consistently held, reasonable agency position that is not contrary to statutory or case law.

■ The only question presented for our resolution in this case is whether the tuition waivers received by Mrs. Wolpaw would have been excluded from gross income under the tax statutes and regulations in effect on July 18, 1984. The tax provision at the center of this controversy is Section 1853(f)(3) of the Tax Reform Act. Section 1853(f)(3) provides:

(3) Any reduction in tuition provided with respect to a full-time course of education furnished at the graduate level before July 1, 1988, shall not be included in gross income if—

(A) such reduction would not be included in gross income under the Internal Revenue Service regulations in effect on the date of the enactment of the Tax Reform Act of 1984, and

(B) such reduction is provided with respect to a student who was accepted for admission to such course of education before July 1, 1984, and began such course of education before June 30, 1985.

With the exception of subsection 1853(f)(3)(A), the parties agree that Mrs. Wolpaw meets all of the criteria of Section 1853.

We agree with the Wolpaws that a plain reading of the language of Section 1853(f)(3) requires accepting it as a transitional rule to provide relief to graduate students who received tuition reductions that qualified for exclusion under 26 U.S.C. § 117(a)-(c), but who no longer could exclude these amounts because Section 117(d) limited the exclusion to undergraduate students receiving qualified tuition reductions. However, our inquiry does not end here. We must consider whether the tuition waivers benefitting Mrs. Wolpaw were excludable under the regulations in effect on July 18, 1984.

The relevant Treasury Regulations in effect on July 18, 1984, were Treasury Regulations 1.117–1, 1.117–3, and 1.117–4. The Wolpaws argue that they meet the requirements of Section 1853(f)(3)(A) because, as of July 18, 1984, the tuition waivers would have been excluded from their gross income because these were "scholarships" under the regulations. Treas. Regs. §§ 1.117–1, 1.117–3. In 1984, 26 U.S.C. § 117(a) exempted scholarships from gross income, but Congress did not provide any guidance as to what types of arrangements qualified as "scholarships." Thus, Treasury Regulations 1.117–1(a) and 1.117–3(a) attempted to define what arrangements qualified for excludability. Treasury Regulation 1.117–1(a) provides:

Any amount received by an individual as a scholarship at an educational institution or as a fellowship grant including the value of contributed service and accommodations, shall be excluded from gross income of the recipient subject to the limitations set forth in Section 117(b) and Reg. 1.117–2.

Treas. Reg. § 1.117–1(a) (1984). The limitations in Section 117(b) and Treasury Regulation 1.117–2 concerned payment for teaching

or other part-time work by candidates for degrees and do not affect excludability in this case. More importantly, the regulation defining "scholarship" is Treasury Regulation 1.117–3(a), which provides:

A scholarship generally means an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate *or a graduate,* to aid such individual in pursuing his studies.

Treas. Reg. § 1.117–3(a) (1984) (emphasis added). Thus, the ultimate question for our resolution in this dispute is whether the tuition waivers benefiting Mrs. Wolpaw qualified as "scholarships" under the regulations existing on July 18, 1984. The Supreme Court approved the general definition of scholarship in Treasury Regulation 1.117–3(a) in *Bingler v. Johnson,* 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969), and restated the definition in its own words:

[T]he definitions supplied by the Regulations clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quid pro quo from the recipients.

*Bingler,* 394 U.S. at 751, 89 S.Ct. at 1445. The Commissioner argues that the tuition waivers provided by the University are part of a *quid pro quo* arrangement, and therefore constitute compensation both under *Bingler* and under Treasury Regulation 1.117–4(c).

The Wolpaws argue that the tuition waivers are "scholarships" because, pursuant to these regulations, relevant appellate case law, and an Internal Revenue Service private letter ruling, tuition waivers received by the dependents of faculty members at qualified educational institutions were excludable as scholarships on July 18, 1984. To support their position, the Wolpaws maintain that a tuition waiver is a scholarship because it is an amount "allowed ... for the benefit of a student" to aid her in the pursuit of graduate studies. Treas. Reg. § 1.117–3(a). They also point out that the last sentence of Treasury Regulation 1.117–3(a) provides an exclusion for tuition remissions benefitting the children of faculty members at one educational institution by another institution (a bilateral arrangement). The last sentence of Treasury Regulation 1.117–3(a) states:

If an educational institution maintains or participates in a plan whereby the tuition of a child of a faculty member of such institution is remitted by any other participating educational institution attended by such child, the amount of the tuition so remitted shall be considered to be an amount received as a scholarship.

This sentence shows that, on and prior to July 18, 1984, the Commissioner had interpreted Section 117 to permit exclusion of tuition remissions in bilateral arrangements as scholarships. The Commissioner, however, argues that the language of Treasury Regulation 1.117–3(a) should be narrowly construed to mean that only tuition remissions given to faculty by *other* educational institutions are considered "scholarships." Thus, the Commissioner believes that because Mrs. Wolpaw received her tuition waiver from the institution employing her husband, the value of the tuition benefit received by Mrs. Wolpaw is *not* a scholarship, but compensation for Dr. Wolpaw's services. The Wolpaws counter that this sentence in the regulation was necessary to clarify the excludability of tuition remissions for faculty dependents in bilateral arrangements. The Wolpaws point out that the Commissioner had already interpreted Section 117 as excluding tuition waivers provided by an educational institution for employee dependents studying *at that institution.* To support their contention, the Wolpaws point to Private Letter Ruling 7111300550A (Nov. 30, 1971). While this Private Letter Ruling is not binding precedent upon the Internal Revenue Service as to other taxpayers, or upon this Court, 26 U.S.C. § 6110(j)(3) (1988), in the absence of any Treasury Regulations directly on point, we view it as evidence that the Internal Revenue Service treated tuition remissions like the one benefitting Mrs. Wolpaw as a "scholarship."

Private Letter Ruling 7111300550A concerned a program whereby the Board of Trustees of a university authorized a waiver of one-half of the base tuition for dependents

of qualified personnel. The program did not (i) require the employee to perform additional services beyond those already rendered, (ii) dictate that the course work be related to the scope of the employee's employment, or (iii) differentiate between faculty or staff classifications for the purpose of eligibility other than with respect to length of service. In assessing the bilateral remission language of Treasury Regulation 1.117–3(a), the ruling notes that this language is a restatement from the committee reports, which was inserted without further explanation. *See* H.R.Rep. No. 1337, 83d Cong., 2d Sess. A37 (1954) and S.Rep. No. 1622, 83d Cong., 2d Sess. 188 (1954). In concluding that the waiver of tuition was excludable from income as a "scholarship," the Internal Revenue Service determined that "the same result should obtain where an educational institution maintains a plan to waive the tuition of the dependent children of its faculty members when such children attend the educational institution that employs the parents." This ruling explicitly stated that the exclusion from gross income applies to spouses as well as children.

The Wolpaws also rely on this Court's holding in *Western Reserve Academy v. United States,* 801 F.2d 250 (6th Cir.1986), to support their contention that the Commissioner had interpreted tuition waivers for graduate students as excludable scholarships prior to 1984. In *Western Reserve,* the issue was whether cash tuition assistance awards, paid directly to Western Reserve faculty members to help them defray the cost of their children's undergraduate college expenses, constituted compensation to those employees. The plaintiffs in *Western Reserve* argued that the cash tuition assistance awards were "scholarships" under Treasury Regulation 1.117–3. The Commissioner, in turn, argued that these awards were "compensation" under Treasury Regulation 1.117–4(c). In *Western Reserve,* this Court affirmed and adopted the district court's opinion. 801 F.2d at 251. The district court held that these cash payments were properly characterized as compensation, stating:

> Because the tuition assistance awards at issue in this action are actual cash awards made by the employer of the recipients' faculty member-parents, they differ signifi-

cantly from the tuition remittance programs [described in Treas. Reg. § 1.117–3(a), last sentence].

619 F.Supp. 394, 399 (N.D. Ohio 1985). Thus, by adopting the district court's reasoning, this Court implicitly decided that we do not consider tuition remittances to be "compensation." We continue to agree with *Western Reserve* and believe that the bilateral tuition remittance program described in Treasury Regulation 1.117–3 is significantly different from cash awards considered in *Western Reserve.* Because we find no reasonable distinction between the bilateral program that existed under Treasury Regulation 1.117–3 and the "unilateral" program operated by Case Western Reserve University in this case, we believe that the tuition waivers received by Mrs. Wolpaw were "scholarships" in 1984 and, therefore, that the Wolpaws properly excluded these waivers from their gross income in 1987 and 1988.

We also believe that under *Bingler,* the tuition waivers qualify as "relatively disinterested" education grants with no requirement of any substantial *quid pro quo.* Whether a tuition remission is "relatively disinterested" is certainly a judgment call and a matter of degree. Almost every (if not all) scholarship or fellowship grant offered to students benefits the educational institution as well as the student. We agree with the reasoning of the Commissioner in Private Letter Ruling 7111300550A and believe that the tuition waiver arrangement here is sufficiently disinterested to qualify as a "scholarship." We are particularly persuaded by the fact that neither Dr. Wolpaw nor Mrs. Wolpaw is required to perform any service over and above Dr. Wolpaw's services, which are already provided to and independently compensated by the University.

Further, we believe that Treasury Regulation 1.117–4(c) is not applicable here. Again, this regulation requires that "any amount paid or allowed to, or on behalf of, an individual *to enable him to pursue studies or research*" be included in gross income *if* such amount represents compensation for services. Treas. Reg. § 1.117–4(c)(1) (emphasis added). Thus, if the tuition or tuition

waivers are paid to, allowed to, or are on behalf of the person who is pursuing studies or research, then this regulation would apply, and any amounts representing compensation for services would be included in gross income. In this case, however, the Tax Court found that the tuition waivers were allowed to *Dr.* Wolpaw, but the individual who pursued "studies or research" was *Mrs.* Wolpaw. Furthermore, Treasury Regulation 1.117–4(c) would not require inclusion of the waiver because, as we have said, the tuition waivers do not represent compensation for services rendered. Therefore, we do not believe Treasury Regulation 1.117–4(c) is applicable here.

Finally, in addition to the clear language of the statutes and regulations discussed above, we believe that prior to July 18, 1984, the Commissioner considered graduate level tuition waivers received by faculty dependents to be excludable under Section 117 as scholarships. Until this case arose, the Commissioner's position had been that tuition waivers or remissions for faculty dependents pursuing graduate studies were not "compensation," but qualified as scholarships under Treasury Regulation 1.117–3(a) (bilateral arrangements) and Private Letter Ruling 7111300550A (tuition remissions for dependents used at the granting institution). Therefore, because the Commissioner's pre-July 1984 position is not contrary to the plain meaning of 26 U.S.C. § 117, and because the regulations and private letter ruling interpreting Section 117 show a consistently held and reasonable view that these tuition waivers were not includable in gross income as of July 18, 1984, we defer to this interpretation and consequently reverse the decision of the Tax Court and remand the case for recomputation of the taxes due.